Slip Op. 11-6

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌─────────────────────────────────────┐
│ PAKFOOD PUBLIC COMPANY               │
│ LIMITED, et al.,                     │
│                                      │
│                   Plaintiffs,        │
│                                      │
│              - v -                   │
│                                      │
│ THE UNITED STATES, et al.,           │
│                                      │
│                   Defendants.        │
└─────────────────────────────────────┘
```

Before: Pogue, Chief Judge

Consol.[1] Court No. 09-00430

OPINION

[Affirming Department of Commerce's remand results]

Dated: January 18, 2011

Trade Pacific PLLC (Robert G. Gosselink and Jonathan M. Freed) for Plaintiffs and Defendant-Intervenors Pakfood Public Co., Ltd.; Asia Pacific (Thailand) Co., Ltd.; Chaophraya Cold Storage Co., Ltd.; Okeanos Co., Ltd.; Okeanos Food Co., Ltd.; and Takzin Samut Co., Ltd.

White & Case LLP (Walter J. Spak and Jay C. Campbell) for Consolidated Plaintiffs and Defendant-Intervenors Andaman Seafood Co., Ltd.; Chanthaburi Frozen Food Co., Ltd.; Chanthaburi Seafoods Co., Ltd.; Phatthana Seafood Co., Ltd.; Phatthana Frozen Food Co., Ltd.; Thailand Fishery Cold Storage Public Co., Ltd.; Thai International Seafoods Co., Ltd.; Sea Wealth Frozen Food Co., Ltd.; and Rubicon Resources, LLC.

Akin Gump Strauss Hauer & Feld LLP (Warren E. Connelly and Jarrod M. Goldfeder) for Consolidated Plaintiffs and Defendant-Intervenors Thai Union Frozen Products Public Co., Ltd. and Thai Union Seafood Co., Ltd.

Picard Kentz & Rowe LLP (Andrew W. Kentz and Nathaniel J. Maandig Rickard) for Consolidated Plaintiff and Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

---

[1] The actions consolidated herein include Court Nos. 09-00443, 09-00445, and 09-00447, in addition to the captioned matter.

    <u>Stewart and Stewart</u> (<u>Geert M. De Prest</u> and <u>Elizabeth J. Drake</u>) and <u>Leake & Andersson, LLP</u> (<u>Edward T. Hayes</u>) for Consolidated Plaintiff-Intervenor and Defendant-Intervenor The Domestic Processors.

    <u>Tony West</u>, Assistant Attorney General; <u>Jeanne E. Davidson</u>, Director; <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Stephen C. Tosini</u>), and, of counsel, <u>Jonathan M. Zielinski</u>, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, for Defendant United States.

    **Pogue, Chief Judge:**  This action is again before the court following a remand to the United States Department of Commerce ("Commerce" or "the Department") of the results of an administrative review of an antidumping ("AD") duty order.[2]  The three issues presented are whether, in the selection of respondents in this review, Commerce's use of data obtained from United States Customs and Border Protection ("Customs" or "CBP") (A) is arbitrary in light of Commerce's prior and concurrent practice for making such determinations, (B) constitutes a reasonable application of the AD statute, and (C) is supported by substantial evidence on the record.  The court answers the first

---

    [2] Specifically at issue is the remand of the third administrative review of the AD duty order covering certain frozen warmwater shrimp from Thailand. <u>See</u> <u>Pakfood Pub. Co. v. United States</u>, __ CIT __, 724 F. Supp. 2d 1327, Slip Op. 10-99 (Sept. 01, 2010) ("<u>Pakfood I</u>") (remanding <u>Certain Frozen Warmwater Shrimp From Thailand</u>, 74 Fed. Reg. 47,551 (Dep't Commerce Sept. 16, 2009) (final results and partial rescission of AD duty administrative review) ("<u>Final Results</u>")).  The period of review ("POR") was February 1, 2007 through January 31, 2008. <u>Final Results</u>, 74 Fed. Reg. at 47,551.

question in the negative and latter questions in the affirmative,

and therefore affirms the remand results.

**BACKGROUND**

A.   Pakfood I

The issues presented, and the Department's reliance on CBP

data, arose from Commerce's initial indication, in its Notice of

Initiation for the instant administrative review, that it

intended to exercise its discretion under Section 777A(c)(2) of

the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2)

(2006),[3] to limit the number of respondents selected for

individual review.[4] Certain Frozen Warmwater Shrimp from Brazil,

---

[3] All further citations to the Tariff Act of 1930 are to
Title 19 of the United States Code, 2006 edition.

[4] The AD statute provides a general rule and an exception
governing the Department's determination of dumping margins in AD
investigations and administrative reviews of AD duty orders.
19 U.S.C. § 1677f-1(c).  The general rule states that, "[i]n
determining weighted average dumping margins [in AD
investigations and administrative reviews of AD duty orders],
[Commerce] shall determine the individual weighted average
dumping margin for each known exporter and producer of the
subject merchandise." Id. at § 1677f-1(c)(1).  The exception to
this general rule provides that
    If it is not practicable to make individual weighted
    average dumping margin determinations [] because of the
    large number of exporters or producers involved in the
    investigation or review, [Commerce] may determine the
    weighted average dumping margins for a reasonable
    number of exporters or producers by limiting its
    examination to –
        (A) a sample of exporters, producers, or types of
        products that is statistically valid based on the
        information available to [Commerce] at the time of
                                            (continued...)

<u>Ecuador, India, and Thailand</u>, 73 Fed. Reg. 18,754, 18,765 (Dep't
Commerce Apr. 7, 2008) (notice of initiation of AD reviews)
("<u>Notice of Initiation</u>").  At the same time, Commerce announced
that, "[i]n selecting the respondents for individual review, the
Department intends to select respondents based on [CBP] data for
U.S. imports during the [POR]," <u>id.</u>, and that, in using such
data, "[a]bsent information to the contrary," it would continue
to treat respondents found to be collapsible into single entities
in prior segments of the administration of this AD duty order
(i.e., the underlying AD investigation and prior administrative
reviews) as single entities also in this review. <u>Id.</u> at 18,764
nn. *-****.[5]

---

[4](...continued)
        selection, or
        (B) exporters and producers accounting for the
        largest volume of the subject merchandise from the
        exporting country that can be reasonably examined.

<u>Id.</u> at § 1677f-1(c)(2).

[5] The Department stated that it would release the CBP data
under administrative protective order ("APO") to all parties
having an APO within five days of publication of the <u>Notice of
Initiation</u>, <u>id.</u> at 18,765, and invited "comments regarding the
CBP data and respondent selection" within ten days of publication
of the notice. <u>Id.</u> at 18,766.  The CBP data were provided to all
interested parties having APO access on April 9, 2008. Mem. Re.
Selection of Resp'ts for Individual Review, A-549-822, ARP 07-08
(May 27, 2008), Admin. R. Pub. Doc. [<u>Pakfood I</u>] 67 ("<u>Resp't
Selection Mem.</u>") 2. (All further citations to the "Admin. R."
refer to the initial administrative record filed by the
Department in <u>Pakfood I</u>.  The administrative record of the remand
redetermination is hereafter referred to as the "Remand Admin.
(continued...)

After receiving and considering comments from, *inter alia*,
Petitioner, Plaintiff Ad Hoc Shrimp Trade Action Committee
("AHSTAC"), and two potential respondents, the Department
determined that it would limit its examination to the two
producer/exporter entities accounting for the largest volume of
subject imports during the POR. Resp't Selection Mem. 2-6.  The
two mandatory respondents were then selected on the basis of CBP
data – specifically, data for all entries of merchandise covered
by the order during the POR ("CBP data")[6] – and company
affiliations found to exist in prior segments. Id. at 6-7; I & D
Mem. Cmt. 2 at 8-10.    In Pakfood I, AHSTAC argued, *inter alia*,
that Commerce's reliance on CBP data in selecting the mandatory
respondents for this review was inconsistent with the prior
practice of using information obtained from quantity and value
("Q&V") questionnaires, and therefore arbitrary. Pakfood I, Slip
Op. 10-99, at 8.  The court agreed.

Specifically, Pakfood I concluded, on the record then before
the court, that Commerce, without sufficient explanation,
continues to use Q&V questionnaires in some administrative

---

[5](...continued)
R.")

[6] See Issues & Decision Mem., A-549-822, ARP 07-08 (Sept.
08, 2009), Admin. R. Pub. Doc. 281 ("I & D Mem.") (incorporated
into Final Results, 74 Fed. Reg. at 47,553) Cmt. 2 at 6.  The
Department relied on "type 3" entries – i.e., AD or
countervailing duty entries for consumption. Id.

proceedings and to use CBP data in others.  Accordingly, the
court held that, "[r]egardless of the reasonableness of using CBP
entry data to select mandatory respondents, [] the Department's
apparently arbitrary and inconsistent employment of this
methodology is not, without more adequate explanation, consistent
with basic principles of the rule of law." Id. at 13 (citations
omitted).  The court therefore remanded the issue, instructing
the Department to either provide an adequate explanation for its
apparent methodological inconsistency, or else apply a
methodology consistent with that applied in like circumstances.
Id. at 14.

B.    Remand Results

       In its Final Results Pursuant to Court Remand, the
Department reiterates its position that, while it has used Q&V
questionnaires to select mandatory respondents in past
administrative proceedings, "'the Department's current practice
is to select respondents using CBP data . . . .'" Final Results
Pursuant to Court Remand (Oct. 29, 2010), Remand Admin. R. Pub.
Doc. 5 ("Remand Results") at 3 (quoting I & D Mem. Cmt. 2 at 9-10
(citations omitted)).  The agency explains its change in practice
as necessary "to improve the efficiency of the respondent
selection process." Id. at 4.[7]

───────────────

       [7] Citing Commerce's "experience with Q&V questionnaires for
                                                    (continued...)

In the Remand Results, Commerce also explains apparent

inconsistencies in applying this methodology[8] – identified by the

court in Pakfood I, Slip Op. 10-99 at 9-10[9] – as exceptions to

---

[7](...continued)
respondent selection purposes in several cases," id. at 3, the
Department explains that, "because of the difficulty and
resources involved in obtaining proper responses from the large
numbers of companies for which a review was requested, reliance
upon Q&V data resulted in delays in the ability of the Department
to select respondents and issue questionnaires." Id.

[8] Commerce "acknowledges that, at the time the respondent
selection was made in this review, the Department's practice to
rely upon CBP data for determining the largest exporters of
subject merchandise was relatively new and thus not articulated
as clearly as it was subsequently." Remand Results 5.

[9] The court cited to Wooden Bedroom Furniture from the
People's Republic of China, 74 Fed. Reg. 8,776 (Dep't Commerce
Feb. 26, 2009) (initiation of AD duty administrative review),
75 Fed. Reg. 5,952 (Dep't Commerce Feb. 5, 2010) (preliminary
results of AD duty administrative review and intent to rescind
review in part), 75 Fed. Reg. 9,869 (Dep't Commerce Mar. 4, 2010)
(initiation of administrative review of the AD duty order);
Certain Polyester Staple Fiber from the People's Republic of
China, 74 Fed. Reg. 32,125 (Dep't Commerce July 7, 2009)
(preliminary results of AD duty administrative review and
extension of time limit for final results); Polyethylene Retail
Carrier Bags from the People's Republic of China, 73 Fed. Reg.
52,282 (Dep't Commerce Sept. 9, 2008) (preliminary results of AD
duty administrative review). Slip Op. 10-99 at 10 n.13.
In its Remand Results, the Department distinguishes the
facts of Wooden Bedroom Furniture, see infra note 11 and Remand
Results at 6 n.5, and Polyester Staple Fiber, see infra note 13.
With respect to Polyethylene Retail Carrier Bags, the Department
notes that, although the preliminary results of that AD duty
order review were released shortly after the initiation of the AD
duty order review at issue in this case, the review in
Polyethylene Retail Carrier Bags was initiated in September 2007
and respondent selection was made in October 2007, at which time
"the Department had not [yet] established the practice of relying
on CBP data where practicable for respondent selection." Remand
                                              (continued...)

its regular practice. <u>Remand Results</u> 5-7 (distinguishing reviews

where "the Department explained that, while its practice is to

use CBP data for respondent selection, the CBP data for the

particular merchandise covered by those reviews w[ere] not

adequate for selecting respondents in those reviews," and

explaining that, "[i]n arriving at these conclusions, the

Department drew from its expertise and knowledge of the industry

derived from previous segments of the proceedings in question").

(<u>See also</u> Def.'s Resp. to Ad Hoc's Remand Comments ("Def.'s Br.")

3 ("Commerce's practice is to rely upon CBP data unless those

data are unusable.  The cases in which Commerce has issued [Q&V]

---

⁹(...continued)
<u>Results</u> at 7 (noting that "the Department did not begin
announcing in initiation notices its intention to rely upon CBP
data until after [October 2007]" (citing <u>Lightweight Thermal</u>
<u>Paper from Germany, the Republic of Korea, and the People's</u>
<u>Republic of China</u>, 72 Fed. Reg. 62,430, 62,435 (Dep't Commerce
Nov. 5, 2007) (notice of initiation of AD duty investigation);
<u>Sodium Nitrite from the Federal Republic of Germany and the</u>
<u>People's Republic of China</u>, 72 Fed. Reg. 68,563, 68,567 (Dep't
Commerce Dec. 5, 2007) (initiation of AD duty investigations);
<u>Uncovered Innerspring Units from the People's Republic of China,</u>
<u>South Africa, and the Socialist Republic of Vietnam</u>, 73 Fed. Reg.
4,817, 4,822 (Dep't Commerce Jan. 28, 2008) (initiation of AD
duty investigations))).
        In addition, to further highlight the types of exceptional
circumstances, not evidenced here, under which Commerce may
depart from its stated practice, the Department also cites to a
number of additional cases where it has deviated from its newly
established practice of relying exclusively on CBP data for the
selection of mandatory respondents in AD duty order
administrative proceedings. <u>Remand Results</u> at 5-6 (arguing, at 5,
that "the Department's reliance on CBP data for respondent
selection as the norm is more evident in the exception"); <u>see</u>
<u>infra</u> notes 10-12.

questionnaires involved determinations that CBP data were

unusable." (citing Remand Results 3-5).)

Specifically, the Department points to certain

circumstances, not evidenced in the instant review, which may

render reliance on CBP data inappropriate.  Such circumstances

may consist of industry-specific characteristics, such as a

significant volume of resold merchandise, unique cash-deposit

structures, and/or AD duty orders whose scope includes parts of

merchandise as well as the finished products.[10]  Further

exceptional circumstances, again not evidenced here, include

situations where "the units used to measure import quantities [in

---

[10] Remand Results at 5 (quoting Mem. to File, Resp't
Selection Mem. from Other Proceedings (Oct. 6, 2010), Remand
Admin. R. Pub. Doc. 1 ("Resp't Mem. from Other Proceedings")
Attach. 3 (Ball Bearings and Parts Thereof from Various
Countries, A-100-001, ARP 07-08, Mem. Re Data for Selection of
Resp'ts (July 3, 2008)) 2-3 ("Based upon our experience with
these bearings proceedings, the significant volume of resold
merchandise, and the cash-deposit hierarchy, due to the unique
nature of the ball-bearings industry the respondent-selection
process may be distorted significantly if we rely on CBP data to
select respondents for individual examination.  In addition,
these proceedings are characterized by the fact that the scope of
the orders includes parts of bearings and not just finished
bearings. . . . [E]xperience indicates that the CBP volume data
will reflect the commingling of parts and finished bearings which
may affect the reliability of CBP data for use in the respondent-
selection decisions for these reviews of the orders on ball
bearings . . . .  Because of the large number of parts likely to
have been imported but for which specific information is not yet
available, especially in combination with the situation we face
in these proceedings as a result of the Department's cash-deposit
hierarchy, we cannot reasonably rely on CBP data for purposes of
respondent selection in ball-bearings proceedings.")).

CBP data] are not consistent for the [tariff code] categories

identified in the [] scope [of the relevant AD duty order]"[11];

where "CBP volume data do not account for [significant]

differences in [merchandise] size and weight [relevant to the

scope of the AD duty order at issue]"[12]; or where the Department

specifically determines that "a significant amount of the volume

in the CBP data [is] unclear."[13]

In the instant review, by contrast, Commerce contends that

"the Department's analysis of the CBP data, supported by the

Department's experience in conducting three previous segments of

the proceeding, demonstrated that the CBP data for entries of

shrimp from Thailand during the POR were adequate, appropriate,

---

[11] Id. at 6 (quoting Resp't Mem. from Other Proceedings
Attach. 4 (Wooden Bedroom Furniture from the People's Republic of
China, A-570-890, ARP 08, Mem. Re Resp't Selection (Apr. 20,
2009)) 7 (explaining that inconsistencies in units of measurement
for import quantities of various tariff categories covered by the
AD duty order made "Q&V data [] preferable to the use of CBP data
in this particular proceeding because [Q&V data] allows the
Department to follow the express language of [the AD statute],
which requires that the Department select respondents on the
basis of volume (rather than value)")).

[12] Id. (quoting Resp't Mem. from Other Proceedings Attach. 5
(New Pneumatic Off-the-Road Tires from the People's Republic of
China, A-570-912, ARP 08-09, Mem. Re Selection of Resp'ts
(Jan. 22, 2010)) 3).

[13] Id. at 7 (quoting Certain Polyester Staple Fiber from the
People's Republic of China, 74 Fed. Reg. 32,125, 32,125 (Dep't
Commerce July 7, 2009) (notice of preliminary results of the AD
duty administrative review and extension of time for the final
results) (cited in Slip Op. 10-99 at 10 n.13)).

and reliable for purposes of determining the largest exporters of

subject merchandise, and thus selecting mandatory respondents."

<u>Remand Results</u> at 7-8 (footnote omitted).[14]

C.   <u>AHSTAC's Comments on the Remand Results</u>

     AHSTAC, the sole party now challenging the <u>Remand Results</u>,[15]

argues that Commerce's process for selecting mandatory

respondents in this review (A) remains an arbitrary departure

from prior practice, (B) is in any case contrary to law[16] –

---

     [14] <u>See also</u> <u>id.</u> at 12 ("In this review, the unit-of-quantity
reported in the CBP data is consistent with the unit of quantity
used in the Department's margin analysis, and there was otherwise
no evidence that CBP data was unsuitable for use in respondent
selection."); <u>id.</u> at 8 (contrasting present review with cases
which "present examples where the Department identified specific
reasons for deviating from its practice of determining
respondents based on CBP data," and arguing that, "[a]s the
problems with the CBP data related to imports of the subject
merchandise in those cases did not apply to the CBP data [in the
review now under consideration], those cases were not 'similarly
situated' to the instant case, and the Department's determination
to rely upon CBP data in this review was consistent with its
practice and was, therefore, not arbitrary or capricious").

     [15] <u>See</u> <u>Remand Results</u> at 9 ("The Rubicon Group states that
the <u>Draft Results</u> provided a reasonable explanation for the
Department's use of CBP data in selecting respondents in the
review at issue, and thus recommends that the Department not make
any changes for the final remand results."). (<u>See also</u> Pls.'
Letter to Ct. (Dec. 6, 2010) [Dkt. No. 59].)

     [16] <u>See</u> <u>Pakfood I</u>, Slip Op. 10-99 at 8 (noting that AHSTAC's
argument from inconsistency with prior practice was one among
others made by AHSTAC).  Because the court agreed with AHSTAC in
<u>Pakfood I</u> that the Department's methodology in this case appeared
to be arbitrarily applied in comparison to seemingly similarly
situated cases, necessitating a remand to both clarify the
                                        (continued...)

because CBP data do not provide sufficient information regarding

exporters of subject merchandise – and (C) is unsupported by

substantial evidence on the record of this review.[17] (See

generally Pl.'s Comments on Final Results of Redetermination

Pursuant to Ct. Remand ("AHSTAC's Br.").[18])

---

[16](...continued)
Department's practice and ensure its consistent application, the
court did not have occasion in Pakfood I to address those of
AHSTAC's arguments directed at the legality of reliance on CBP
data as a consistent practice. See id. at 13 ("[W]here an agency
is afforded a measure of discretion in administering a statute,
the exercise of that discretion is not in accordance with law if
it is arbitrary, such as where the agency treats like cases
differently.  . . .  Regardless of the reasonableness of using
CBP entry data to select mandatory respondents, [] the
Department's apparently arbitrary and inconsistent employment of
this methodology is not, without more adequate explanation,
consistent with basic principles of the rule of law." (citations
omitted)).

[17] In its evidentiary claim, as explained below, AHSTAC
argues both that the reliability of the CBP data used to select
mandatory respondents in this review was not supported by
substantial evidence on the record, and that the Department's
use, for purposes of respondent selection, of company affiliation
data derived from prior segments of the administration of this AD
duty order was not supported by substantial evidence on the
record of this review.

[18] The court has construed AHSTAC's comments on the remand
results in accordance with the applicable standards of review.
Specifically, AHSTAC's argues, first, that Commerce's
reliance on CBP data for respondent selection in this case is
arbitrary and capricious because (1) the information obtained
from Q&V questionnaires, used prior to the agency's change in
practice and in exceptional circumstances where CBP data are
determined to be usable, is substantially different from the
information available in CBP data; (2) responses to Q&V
questionnaires have played a significant role in identifying
affiliates as collapsible entities in the shrimp administrative
                                                 (continued...)

After summarizing the applicable standard of review, the court will consider, in turn, each of AHSTAC's challenges to the Remand Results.

## STANDARD OF REVIEW

As is always the case, the issues presented here are necessarily framed by the court's standard of review. Specifically, "[t]he court will sustain the Department's

---

[18](...continued)
reviews; and (3) the substantial differences in respective burdens imposed on domestic interested parties and foreign exporters/manufacturers in review proceedings using CBP data for respondent selection and those relying on Q&V questionnaires has no rational basis. (AHSTAC's Br. 8-20.)  Construed in terms of the applicable standard of review, as explained below, this set of contentions amounts to an argument that Commerce's reliance on CBP data for respondent selection in this case is arbitrary and capricious because it constitutes an insufficiently explained departure from prior practice, either because the change in practice was not adequately explained or because continued exceptions to the new practice have not been adequately distinguished.

Second, AHSTAC argues that Commerce's determinations on the basis of CBP data in this case were not supported by substantial evidence because such data do not provide sufficient information as to exporters of subject merchandise; because the accuracy of the data was presumed; and because such data do not include information with respect to company affiliations. (See id. at 20-22.)  As explained below, see infra note 23, the question of whether the CBP forms relied on by Commerce in this case request information sufficient to satisfy the relevant statutory requirements is a question of law, and will be addressed as such by the court.  With respect to company affiliations, however, because Commerce supplemented its analysis of CBP data in this case with information regarding company affiliations obtained in prior segments of the administration of this AD duty order, see supra note 5 and accompanying text, the question before the court is whether such information constitutes substantial evidence in support of the agency's aggregated entry volume determinations in selecting mandatory respondents for this review.

determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law." Jinan Yipin Corp. v. United States, __ CIT __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).

Where, as here, Commerce adopts a practice that substantially deviates from precedent,[19] it must at least acknowledge the change and show that there are good reasons for the new policy, see FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1811 (2009); Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003),[20] and the new

---

[19] See Remand Results 7 ("At th[e] time [of October 2007], the Department had not [yet] established the practice of relying on CBP data where practicable for respondent selection.  Rather, the Department did not begin announcing in initiation notices its intention to rely upon CBP data until after that date." (citing notices of initiation of AD duty investigations beginning in November 2007)). See also id. at 5 (explaining that, "at the time the respondent selection was made in this review, the Department's practice to rely upon CBP data for determining the largest exporters of subject merchandise was relatively new").

[20] This is not to say that Commerce's prior determinations are legally binding in subsequent administrative proceedings. See Alloy Piping Prods, Inc. v. United States, No. 08-00027, 2009 WL 983078, at *6 (CIT 2009) ("Even assuming Commerce's determinations at issue are factually identical, as a matter of law a prior administrative determination is not legally binding on other reviews before the court.").  On the contrary, all determinations in a given proceeding must be justified on the basis of the evidence on the record of the particular administrative proceeding at issue. 19 U.S.C. § 1516a(b)(1)(B)(i) (determinations unlawful if "unsupported by substantial evidence on the record"); id. at § 1516a(b)(2)(A) (defining "record" to
(continued...)

practice must be within the scope of authority granted to
Commerce by the AD statute. See, e.g., Nakornthai Strip Mill Pub.
Co. v. United States, __ CIT __, 587 F. Supp. 2d 1303, 1307
(2008) ("Commerce has discretion to change its policies and
practices as long as they are reasonable and consistent with
their statutory mandate and may adapt its views and practices to
the particular circumstances of the case at hand, so long as the
agency's decisions are explained and supported by substantial
evidence on the record." (quotation and alteration marks and
citation omitted)).

Because neither the AD statute nor any of Commerce's
regulations directly address the methodology by which the
Department is to arrive at the number of "exporters and producers
accounting for the largest volume of the subject merchandise from
the exporting country that can be reasonably examined," 19 U.S.C.
§ 1677f-1(c)(2)(B), the court will uphold Commerce's methodology

---

[20](...continued)
consist of "information presented to or obtained by [Commerce] in
the course of the administrative proceeding"). Nevertheless,
Commerce must comply with the basic principle of law that, absent
a rational explanation for acting to the contrary, like cases
should be decided alike. See Martin v. Franklin Capital Corp.,
546 U.S. 132, 139 (2005) ("[L]imiting [agency] discretion
according to legal standards helps promote the basic principle of
justice that like cases should be decided alike."); SKF USA Inc.
v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[I]t is
well-established that an agency action is arbitrary when the
agency offers insufficient reasons for treating similar
situations differently.").

if it is reasonable, see Chevron U.S.A. Inc. v. Natural Res. Def.
Council, Inc., 467 U.S. 837, 843 (1984), and is not arbitrarily
applied. See, e.g., U.S. Steel Corp. v. United States, 621 F.3d
1351, 1357 (Fed. Cir. 2010) ("The court must, as we do, defer to
Commerce's reasonable construction of its governing statute where
Congress leaves a gap in the construction of the statute that the
administrative agency is explicitly authorized to fill or
implicitly delegates legislative authority, as evidenced by the
agency's generally conferred authority and other statutory
circumstances." (quotation marks and citation omitted)).

     The application of a practice in a given case is supported
by "substantial evidence" when it is supported by "such relevant
evidence [on the record] as a reasonable mind might accept to
support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S.
474, 477 (1951) (quotation marks and citation omitted).  "The
specific determination [the court] make[s] is whether the
evidence and reasonable inferences from the record support
[Commerce's] finding." Daewoo Elecs. Co. v. Int'l Union of Elec.,
Elec., Technical, Salaried & Mach. Workers, AFL-CIO, 6 F.3d 1511,
1520 (Fed. Cir. 1993) (quotation marks and citation omitted).

**DISCUSSION**

A.   The Department's Methodology for Respondent Selection in
     this Case Is Not an Arbitrary Departure from Prior Practice.

     In light of the explanation provided in the Remand Results,

the Department's announced methodology for selecting mandatory

respondents based on import volume was not arbitrarily applied in

this review.   In the Remand Results, the Department explained

that its decision to change from the issuance of Q&V

questionnaires in selecting mandatory respondents to the use of

CBP data was grounded in the substantial ease of administrative

burden afforded by such an approach.[21]

    Administrative convenience of the government constitutes a

_____

    [21] Specifically, in its Remand Results, the Department
provides the following explanation for its change in practice:

    The Department developed the practice of using CBP data
    based upon its experience with Q&V questionnaires for
    respondent selection purposes in several cases,
    including prior administrative reviews of shrimp from
    Thailand.  In those cases, because of the difficulty
    and resources involved in obtaining proper responses
    from the large numbers of companies for which a review
    was requested, reliance upon Q&V data resulted in
    delays in the ability of the Department to select
    respondents and issue questionnaires.  [. . .]  Given
    these experiences with Q&V questionnaires in other
    cases, including the previous two reviews of shrimp
    from Thailand, the Department sought to improve the
    efficiency of the respondent selection process.  Thus,
    as Commerce explained in the [I & D Mem.] at Comment 2,
    'selecting respondents from CBP data provides an
    alternative that is much more administratively
    practicable, given that relying on Q&V responses in
    this proceeding requires significant resources to send
    and track the delivery of numerous Q&V questionnaires
    and responses, and to aggregate and analyze the
    numerous responses.'  As a result, the Department's use
    of CBP data in this review allowed for respondent
    selection and antidumping duty questionnaire issuance
    in half the time of the previous reviews . . . .

Remand Results 3-4 (quoting I & D Mem. Cmt. 2 at 10).

reasonable and rational basis for agency action. <u>See, e.g.</u>,
<u>Consol. Edison Co. of N.Y., Inc. v. Abraham</u>, 314 F.3d 1299, 1304
(Fed. Cir. 2002) (per curiam) (holding that administrative
convenience constitutes "a reasonable and rational basis" for
agency action).  Accordingly, the Department has both
acknowledged and adequately stated the reasons for its change in
practice.

In addition, Commerce has complied with the court's remand
order by providing an adequately reasoned explanation
distinguishing the present case from cases in which the
Department continues to employ a different respondent selection
methodology.  Explaining that "the Department turns to issuing
Q&V questionnaires or other sources of information when the CBP
data for the subject merchandise in question does not provide
sufficient or adequate data for the Department's respondent
selection purposes," <u>Remand Results</u> 5, the Department
distinguished each of the cases in which it used Q&V
questionnaires as instances where the CBP data was found to be
unreliable, inconsistent, or failing to provide "adequate
relevant information for determining the relative volume of
imports." <u>Id.</u> at 6; <u>see</u> *supra* notes 9-13.  Thus, Commerce
explains that "its current practice is to rely upon CBP data to
select respondents, and that it has departed only in cases in
which CBP data are unusable." (Def.'s Br. 3.)

Because, as discussed below, the record of this review did

not present any evidence calling into doubt the usability of CBP

data for respondent selection in this case, the identified cases

in which the Department has continued to apply a different

respondent selection methodology due to exceptional circumstances

are not 'like cases' to this case, and the Department's deviation

from those cases here is therefore not arbitrary.[22]

B.     The Department's Methodology for Respondent Selection in
       this Case Is Not Contrary to Law.

AHSTAC also claims that the Department's respondent

selection methodology is contrary to law because CBP data provide

insufficient information with respect to exporters of subject

merchandise. (See AHSTAC's Br. 21.[23]) This challenge must also be

---

[22] AHSTAC also challenges the Remand Results on the ground
that they "offer no explanation for the substantial discrepancy
in the information compiled for the administrative record for the
purposes of respondent selection under different methodologies."
(AHSTAC's Br. 13.)  Because the Department has adequately
explained its departure from its prior practice, the question is
not, as AHSTAC seems to contend, whether the CBP data now used
provide the Department with exactly the same information as that
provided by Q&V questionnaires, used in the past or in
exceptional circumstances, not applicable here, where CBP data
are determined to be unusable.  Rather, the relevant questions,
to which the court now turns, are whether the CBP data now used
provide the Department with the information upon which the
statute requires the Department's decision to be based, and
whether the Department's conclusions here were supported by
substantial evidence.

[23] While AHSTAC styles this argument as one within the scope
of substantial evidence review (AHSTAC's Br. 20), the question of
whether the manufacturer ID block in CBP Form 7501 requests
                                                  (continued...)

rejected.

AHSTAC's claim relies on the argument that CBP data "include[] no information with regard to the exporter other than a 'manufacturer ID block' . . . ." (Id.) See 19 U.S.C. § 1677f-1(c)(2)(B) (allowing limitation of examination to "*exporters* and producers accounting for the largest volume of subject merchandise from the exporting country that can be reasonably examined" (emphasis added)).  However, AHSTAC fails to provide any support for its conclusion that the Department's reliance on the manufacturer ID block in CBP Form 7501 fails to satisfy the statutory requirement that exporters be taken into account when limiting individual examination pursuant to Section 1677f-1(c)(2)(B). (See AHSTAC's Br. 21.[24])

---

[23](...continued)
sufficient information regarding the exporter of subject merchandise to comport with the requirements of Section 1677f-1(c)(2) (see AHSTAC's Br. 21) is a question of law.  Further, AHSTAC presents no evidence from the instant review to support an evidentiary claim that the information actually collected within the CBP forms relied upon in this review was anything other than that which was formally requested. (See id. 20-23.)

[24] AHSTAC's argument in this regard is, rather, that "Commerce sought considerably more information regarding subject imports in the Q&V questionnaires and Commerce has not, to date, explained why this additional information is irrelevant when the agency relies on 'type 3' import volume data." (AHSTAC's Br. 21; see also id. at 12.)  As explained above, however, Commerce has sufficiently justified its change in practice.  Accordingly, the question now before the court is whether the agency's current practice comports with the AD statute, not how the practice compares with what was done in the past or with the agency's
(continued...)

As the Department explains, "CBP instructs persons
completing CBP Form 7501 to report the manufacturer ID code
according to 'the invoicing party or parties (manufacturers or
other direct suppliers)'[;] [a]ccordingly, it is reasonable for
the Department to consider the 'invoicing party' to be the
exporter for purposes of determining respondent selection."
Remand Results 10 (quoting Resp't Selection Mem. 6 (quoting CBP
Form 7501 Instructions)).  Because the Department's conclusion in
this regard is reasonable, it is therefore not contrary to law.

C.   The Department's Use of CBP Data Was Supported by
     Substantial Evidence on the Record.

AHSTAC further argues that (1) the reliability of CBP data
used in this case, and (2) Commerce's conclusions regarding
company affiliations, when aggregating entry volume during
respondent selection, were not supported by substantial evidence.
(See AHSTAC's Br. 20-23.)  The court disagrees.

     1.   *The Reliability of CBP Data Used to Select Mandatory
          Respondents in this Review Was Supported by Substantial
          Evidence on the Record.*

In its I & D Memorandum, the Department explained that,

---

[24](...continued)
procedure in exceptional circumstances not applicable to this
case.  Thus, Commerce is correct that "the fact that the Q&V
questionnaires request different information about the exporter
or producer does not affect the reasonableness of considering the
'invoicing party' reported in the CBP data to refer to the
exporter." Remand Results 10.

"[t]he CBP data on which the Department's respondent selection

methodology is based represent[] reliable data on entries of

subject merchandise [because] [t]he data is compiled from actual

entries of merchandise subject to the order based on information

required by and provided to the U.S. government authority

responsible for permitting goods to enter into the United

States[,] [and] the entries compiled in this database are the

same entries upon which the antidumping duties determined by this

review will be assessed." Remand Results 10 (quoting I & D Mem.

Cmt. 2 at 9 (quoting Resp't Selection Mem. 6)).  The court

agrees.

In the absence of evidence in the record that the CBP data –

for merchandise entered during the relevant POR and subject to

the AD duty order at issue – are in some way inaccurate or

distortive, the agency reasonably concluded that such data,

collected in the regular course of business under penalty of law

for fraud and/or negligence,[25] presents reliably accurate

information. See, e.g., Seneca Grape Juice Corp. v. United

---

[25] See 19 U.S.C. § 1592(a)(1) ("[N]o person, by fraud, gross
negligence, or negligence [] (A) may enter, introduce, or attempt
to enter or introduce any merchandise into the commerce of the
United States by means of [] (i) any document or electronically
transmitted data or information, written or oral statement, or
act which is material and false, or (ii) any omission which is
material, or (B) may aid or abet any other person to violate
subparagraph (A)."); id. at §§ 1592(b)(2) & (c) (providing for
penalties for violation of § 1592(a)); 19 C.F.R. § 162.79 (same).

States, 71 Cust. Ct. 131, 142, 367 F. Supp. 1396, 1404 (1973)

(noting "the general presumption of regularity that attaches to

all administrative action" ("In the absence of clear evidence to

the contrary, the courts presume that public officers have

properly discharged their duties . . . .  This presumption, of

course, also attaches to the official actions taken by customs

officers.") (citing, *inter alia*, United States v. Chem. Found.,

272 U.S. 1, 14-15 (1926)) (additional citations omitted)).

Because Customs officers have a duty to assure the accuracy

of information submitted to that agency by penalizing negligent

or fraudulent omissions and/or inaccurate submissions,[26] the

presumption of regularity entails the reasonable conclusion that,

in the absence of evidence to the contrary, the data obtained by

Customs officials in their regular course of business is

accurate.  AHSTAC offers no evidence to the contrary that is

specific to the record for this review. (See AHSTAC's Br. 20-23.)

Accordingly, contrary to AHSTAC's contention (see id. at 21), no

further demonstration regarding the general accuracy of CBP data

for the POR in question is required.

---

[26] See 19 C.F.R. § 162.77(a) ("If the [appropriate Customs]
Officer has reasonable cause to believe that a violation of
[19 U.S.C. 1592 (prohibiting fraudulent and/or negligent
submission and/or omission of material information to Customs)]
has occurred . . . he shall issue to the person concerned a
notice of his intent to issue a claim for a monetary penalty.").

2.  *The Department's Determinations of Company Affiliations in Selecting Mandatory Respondents for this Review Are Supported by Substantial Evidence.*

Finally, AHSTAC argues that, in making its determination regarding which exporters/producers accounted for the largest volume of subject merchandise imported from Thailand during the POR, 19 U.S.C. § 1677f-1(c)(2), Commerce improperly relied on affiliation information obtained in prior reviews,[27] without substantial evidence of the continued accuracy of such affiliation data for the POR at issue.[28]  But AHSTAC's argument

---

[27] As the court recognized in Pakfood I, CBP data omits affiliation information necessary to an accurate determination under Section 1677f-1(c)(2)(B). See Slip Op. 10-99 at 11.  As the Department explained, however, "this review is the fourth segment of this proceeding and [Commerce] ha[s] developed considerable information regarding the affiliations of the requested companies during the previous segments . . . [and] [has] continue[d] to treat any affiliated companies found to be collapsible in previous segments of the proceeding as a single entity in the current segment." Resp't Selection Mem. 7 (citing Notice of Initiation). See also Remand Results 11 ("It is not unreasonable . . . for the Department to take into account affiliation information obtained from previous reviews in analyzing the CBP data in this review for purposes of respondent selection."); id. at 12 (responding to AHSTAC's argument "with respect to considering affiliations in the context of aggregating CBP entry data, the Department explained that it had sufficient information developed from previous segments to identify and determine the largest exporters during the POR").

[28] (See AHSTAC's Br. 20-22 (arguing that Commerce's process of mandatory respondent selection in this review was not supported by substantial evidence because, *inter alia*, "the CBP data provided no information with respect to the consolidation of various manufacturers/producers included in the data").) See also Pet'r's Comments Re Resp't Selection, A-549-822, ARP 07-08 (Apr. 17, 2008), Admin. R. Pub. Doc. 44 ("Pet'r's Comments Re Resp't
(continued...)

misses the mark.

Certainly Commerce's reliance on information obtained in the course of prior segments constitutes use of secondary information within the meaning of 19 U.S.C. § 1677e,[29] and, as such, requires corroboration of its continued accuracy for the POR in question. Statement of Administrative Action, H.R. Rep. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4160 ("SAA"),[30] at 870 ("[S]ection [1677e(c)] requires Commerce [] to corroborate secondary information where practicable using independent sources. Secondary information is information derived from [*inter alia*] any previous review under [19 U.S.C. § 1675] concerning the subject merchandise.  Secondary information may not be entirely reliable because, for example, . . . as in the case of

---

[28](...continued)

Selection") 9-10 ("Without Q&V responses, information regarding affiliation may be inaccurate – no party has certified the affiliation information with respect to the relevant review period . . . .").

[29] 19 U.S.C. § 1677e(c) ("When [Commerce] relies on secondary information rather than on information obtained in the course of an investigation or review, [Commerce] shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal.").

[30] See 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

information from prior section [1675(a)] reviews, it concerns a
different time frame than the one at issue.").[31]  Thus the
corroboration requirement could form a basis for AHSTAC's
challenge.

In this case, however, the Department solicited comments
from interested parties with respect to the data the agency
proposed to use to select mandatory respondents, including with
regard to company affiliations.[32]  Having solicited comments from
interested parties with regard to the continued accuracy of
affiliation information derived from prior segments, and having
received no information to the contrary,[33] the Department

---

[31] See also Sidenor Indus. SL v. United States, __ CIT __,
664 F. Supp. 2d 1349, 1360 (2009) ("Information from a prior
segment of the proceeding . . . is characterized as 'secondary
information.'" (citing SAA at 870)).

[32] See Notice of Initiation, 73 Fed. Reg. at 18,764 nn. *-
**** (explaining that "[a]bsent information to the contrary," the
Department will continue to treat companies found in previous
segments to comprise a single entity as single entities also in
this review); id. at 18,766 (inviting comments regarding
respondent selection within ten days of publication of the Notice
of Initiation).  As explained in the SAA, "independent sources,"
for purposes of corroboration under 19 U.S.C. 1677e(c), may
include "information obtained from interested parties during the
particular investigation or review." SAA at 870.  See also
19 C.F.R. § 351.308(d) (same).

[33] See I & D Mem. Cmt. 2 at 8 (noting that petitioners have
presented no evidence of inaccuracies in the data used by the
Department to select mandatory respondents for this review);
Remand Results 12-13 ("All parties are provided with equal
opportunity to review and comment on the CBP data, at which time
all parties may comment upon whether they believe any export data
                                          (continued...)

reasonably inferred that there were no grounds to believe that

company affiliations have changed during this POR from those

determined to exist in prior segments. See Remand Results 12-13.

When Commerce resorts to information outside the record of a

particular POR, it does not have to prove "that the facts

available are the best alternative information." SAA at 869.

"Rather, the facts available are information or inferences which

are reasonable to use under the circumstances," id., and Commerce

need only "weigh[] the record evidence to determine that which is

most probative of the issue under consideration." Id.[34]

     Here, it was reasonable, under the circumstances, to use

---

[33](...continued)
should be aggregated.  [. . .]  Further, with respect to
considering affiliations in the context of aggregating CBP entry
data, the Department explained that it had sufficient information
developed from previous segments to identify and determine the
largest exporters during the POR.  This information was obtained
from full questionnaire responses from respondents selected in
those segments, and there is no evidence that there was any error
in this regard."). (See also Def.'s Br. 8-9 ("This is exactly
what occurred in the administrative reviews cited by [AHSTAC]
[where respondent selection, in prior reviews, was made on the
basis of questionnaire responses obtained from respondents];
parties noted when they believed that their quantity and value
data should be aggregated. [citing AHSTAC's Br. 14-17] And this
is exactly what occurred here: parties were able to note when
they believed that certain CBP data should be aggregated with
another party's.  The domestic industry possessed the same
opportunity to comment in both situations.  The only difference
is that, in the cases cited by [AHSTAC], parties requested
aggregation, and in this case, no party did.").)

     [34] See also 19 C.F.R. § 351.308 ("Corroborate means that
[Commerce] will examine whether the secondary information to be
used has probative value.").

information on company affiliations obtained in the course of

prior segments,[35] and the continued accuracy of this information

for the instant POR was corroborated by solicitation of comments

from interested parties during this review. See 19 U.S.C.

§ 1677e(c); SAA at 870.  Because AHSTAC has not shown that it or

any other interested party placed any evidence on the record of

this review that would call into doubt the continued veracity of

this information, nothing further is required to support the

Department's conclusion that this information was both probative

and reasonably accurate.[36] Accord Watanabe Grp. v. United States,

---

[35] See, e.g., SKF USA Inc. v. United States, __ CIT __,
675 F. Supp. 2d 1264, 1278 n.8 (2009) (noting that data
pertaining to a previous POR has "some probativity" with respect
to a determination made during a subsequent POR).

[36] The court notes AHSTAC's objection to "the exceptionally
limited timeframe afforded parties by Commerce for the review of
CBP 'type 3' import volume data" (AHSTAC's Br. 19; see also id.
at 22 ("[P]arties had been provided insufficient time to
meaningfully review and identify problems with respect to the CBP
data released.")), see Pet'rs' Comments Re Resp't Selection 10
(contending that petitioners "were afforded less than one week to
comment on data released in four parallel reviews in the midst of
the briefing schedule for the second administrative review
period," and arguing that, "even if [petitioners] had had the
full 10 days [after the date of publication of the Notice of
Initiation], without distraction, to provide comments, it is
unrealistic to expect that the necessary research could be
performed for the listed manufacturers in this case").
However, AHSTAC has provided no evidence of any prejudice
resulting from the short time period provided for the submission
of comments. (See generally AHSTAC's Br.)  Accordingly, AHSTAC's
objection does not state a legal claim. See, e.g., Dorbest Ltd.
v. United States, __ CIT __, 547 F. Supp. 2d 1321, 1334 (2008)
(rejecting plaintiff's contention that "it did not have
                                             (continued...)

No. 09-00520, 2010 WL 5371606, at *4 (CIT Dec. 22, 2010).

## CONCLUSION

For all of the foregoing reasons, the Department's remand

results are AFFIRMED.  Judgment will be entered accordingly.

It is **SO ORDERED**.


                                        ____/s/   Donald C. Pogue____
                                        Donald C. Pogue, Chief Judge

Dated:     January 18, 2011
           New York, N.Y.

---

[36](...continued)
sufficient time" to comment on a draft redetermination proposed
by Commerce, because plaintiff "d[id] not allege specific
prejudice from having such a short time to comment"), aff'd in
part, vacated in part on other grounds, 604 F.3d 1363 (Fed. Cir.
2010). See also 5 U.S.C. § 706 ("[D]ue account shall be taken of
the rule of prejudicial error [in review of administrative agency
action]."); W. Power Sports, Inc. v. United States, __ CIT __,
577 F. Supp. 2d 1314, 1318 (2008) ("A court will not set aside an
agency action for procedural errors unless the errors 'were
prejudicial to the party seeking to have the action declared
invalid.'" (quoting Woodrum v. Donovan, 4 CIT 46, 52, 544 F.
Supp. 202, 207 (1982))); Sea-Land Serv., Inc. v. United States,
14 CIT 253, 257, 735 F. Supp. 1059, 1063 (1990) (same), aff'd,
923 F.2d 838 (Fed. Cir. 1991).

UNITED STATES COURT OF INTERNATIONAL TRADE

```
PAKFOOD PUBLIC COMPANY
LIMITED, et al.,

                     Plaintiffs,

           – v –

THE UNITED STATES, et al.,

                     Defendants.
```

Before: Pogue, Chief Judge

Consol. Court No. 09-00430

<u>JUDGMENT</u>

This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; now therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED and DECREED that the United States Department of Commerce's Final Results Pursuant to Court Remand (Oct. 29, 2010), Remand Admin. R. Pub. Doc. 5, are AFFIRMED.

         /s/   Donald C. Pogue
        Donald C. Pogue, Chief Judge

Dated:     January 18, 2011
           New York, N.Y.